IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ROSELLA LEWIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| **UNIVERSITY OF CHICAGO,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiff, Rosella Lewis (hereinafter referred to as "Plaintiff" or "Lewis"), by her attorneys, The Law Offices of Ruth I. Major, P.C., for her Complaint against Defendant, the University of Chicago, ("Defendant" or the "University"), alleges as follows:

### INTRODUCTION

1. Lewis, who is African American, served as a Department Administrator in the University of Chicago's Political Science Department (the "Department") for over four years. Although Lewis was recognized as an exceptional employee, regularly earning praise from her supervisor and consistently receiving positive performance reviews, Lewis was paid significantly less than her Caucasian colleague despite Lewis performing substantially more work and having supervisory authority over her. Lewis also performed two full time positions for an extended period of time but was only paid for one position though it was the University's practice to compensate White employees for such additional work. Lewis brought this matter to the attention of her managers and Human Resources, who acknowledged the issues but failed to take action to rectify them, forcing Lewis to resign her employment.

1

2. Lewis brings claims against the University for race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), § 701 *et seq.,* 42 U.S.C.A. § 2000e-3(a), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981), and the Equal Pay Act of 2003 ("EPA") 820 ILCS 112/10, *et seq.*

## THE PARTIES

3. Plaintiff Rosella Lewis is an African American woman and a citizen of Illinois.

4. Defendant the University of Chicago is a non-profit corporation incorporated in the State of Illinois. The University of Chicago employees over 8,000 people.

## JURISDICTION AND VENUE

5. Jurisdiction is invoked under 28 U.S.C. § 1331 as this case involves federal questions arising under 42 U.S.C. § 1981, *et seq.*, and Title VII § 701 *et seq.,* 42 U.S.C. § 2000e-3(a). Supplemental jurisdiction over Plaintiff's state law claim is invoked under 28 U.S.C. § 1367.

6. This action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to Lewis' claims occurred in Chicago, Illinois.

## RELEVANT FACTS

7. Plaintiff Lewis was employed by the University of Chicago in the Political Science Department as the Administrator for Faculty and Department Affairs from January 26, 2016 until her separation on September 22, 2020.

8. According to Lewis' job description, her responsibilities included managing daily operations and administrative functions of the Department, including managing the Department's budget and discretionary spending; managing the physical space in which the Department is housed; supervising student support staff; serving as a primary departmental liaison to divisional,

university, and external administrative processes for faculty and academic non-faculty recruitment appointment, and promotions; and providing general administrative support to the chairperson.

9. Lewis was viewed as an exceptional employee by the University. She received a rating of "5" ("Exceptional") in every category in her last written performance review. Dr. William Howell, who was appointed as Chair of the Department in July of 2017 and was Lewis' supervisor, noted that Lewis was "buried with responsibilities," yet "managed the situation with exceptional poise and professionalism." Dr. Howell described Lewis as "incredibly talented" and wrote that no aspect of Lewis' performance required improvement. Lewis received similar reviews throughout her employment with the University.

10. Lewis' colleague in the Department was Kathy Anderson, who held the position of Administrator for Student Affairs for the Department. Though both were at the level of Administrator, by practice Lewis' position within the University was considered a higher level position and Lewis in fact did have limited supervisory authority over Anderson, including approving her requested vacation days. Lewis had no control over Anderson's compensation.

11. In approximately August of 2016, the University's Local Business Center announced it would no longer provide support with regard to processing department expenses. Most of the Departments' expenses were for independent contractors and reimbursing visitors and students.

12. Despite the University's new directive, Anderson unilaterally decided that she would not do so. Because the work had to be done, and in the interest of the Department, Lewis performed the responsibilities of processing the expenses, including the expenses for the students that Anderson was responsible for. Lewis discussed the issue with the then interim Political

Science Department Chair, Dr. John Hansen, seeking assistance in obtaining an equitable distribution of the work.

13. In approximately August of 2016, Lewis was advised by Dr. Hansen that he would look into the matter, but then never followed up with Lewis to provide her a response to her concerns or take any action to resolve the issue. Instead, Lewis continued to process the expenses as the Department was required to do; in stark contrast to Anderson who steadfastly refused to cooperate with the new requirements. Anderson even refused to handle the student reimbursements though she was the Student Administrator.

14. In the fall of 2016, Lewis learned that Anderson was actually being paid more than her in part because she was also being paid to serve as the Department's secretary though she had refused to perform the functions of a secretary for the Department.

15. In the fall of 2016, Christina Klespies, Sr. Human Resources Director, acknowledged at the time that Anderson should not be paid for work she is not performing. Conversely, Klespies acknowledged that Lewis should be paid for work she is performing. Nevertheless, no action was taken to correct Anderson's pay and Anderson continued to earn more than Lewis, though Lewis had more responsibility, authority, and work than Anderson.

16. Lewis continued to handle department expenses, coordinate events, oversee the administration of student employment and special projects in addition to her own responsibilities for Faculty Affairs, support the Chair, and handle the overall administrative responsibilities for the department. Lewis was performing two jobs.

17. Other employees at the University who have assisted with additional work on a temporary basis were given extra service payment for the time in which they performed the extra work. For example, between approximately October 2019 through January 2020, while working

4

full-time in the Psychology Department, the Student Affairs Administrator was paid an extra service payment to assist the Department of Comparative and Human Development while they searched to fill the position for Student Affairs Administrator. She was only paid the extra service pay while performing the additional job duties.

18. In July of 2017, Dr. William Howell was appointed Chair of the Department. During Dr. Howell's first year, Lewis had at least three conversations with him about her workload and the inequities in work distribution and compensation between Lewis and Anderson. Dr. Howell promised to work on getting approval for an additional staff member to assist with administrative work.

19. The University conducted an external review of the political science department in January of 2018. In their report, (completed in February of 2018), the review board recommended that the political science department's administrative staff be increased based on the volume of work Lewis was handling.

20. Based on the review board's recommendation, Lewis received approval to hire a full-time Department Project Coordinator, who would report to her, in the fall of 2018. The new hire, Holly Jaffrey, started on October 1, 2018, with responsibility to relieve Lewis of administration of student employment (approximately 60 student workers per quarter), including the processing of required paper work for new hires, acting as the primary contact for students, human resources and payroll, approving the time students worked for payroll purposes, following up with regard to extensions, processing Department expenses, and handling payment to independent contractors, planning and coordinating Department events, including receptions, luncheons, dinners, end of year party and other special events, managing the logistics for visitors,

handling departmental facility and maintenance requests, maintaining and ordering Department and faculty supplies, and handling other special projects.

21. Immediately after Lewis completed her training of Jaffrey, the Local Business Center, recognizing Jaffrey's potential, offered her a job which was a promotion from the position she held reporting to Lewis. Not surprisingly Jaffrey took the promotion and resigned her position with the Department effective January 20, 2020. Though this created an opportunity for the Department to equitably redistribute work between Lewis and Anderson, that did not occur. Rather, Lewis returned to performing two jobs with no additional compensation.

22. On January 25, 2020, while making room for additional files, Lewis happened upon budget information from 2014 that revealed Anderson's salary, which was at that time approximately $12,000 higher than Lewis' 2020 salary (with annual increases in the years following 2014 the difference could be even greater). Though Lewis handled salary information for the entire Department, Anderson's salary had been excluded and the reason now appeared obvious.

23. Upon information and belief, the disparity in treatment between Lewis and Anderson is the exact opposite of how these two positions are handled throughout the University. Lewis' position, Administrator for Faculty and Department Affairs, is in practice throughout the University treated as the senior role in the department and the Student Affairs Administrator reports to this position. It is typically the better paid position.

24. After discovering this inequitable pay disparity, Lewis again spoke to Dr. Howell to let him know how disappointing it was to learn that Anderson was being paid tens of thousands of dollars more than she was when it was Lewis who was responsible for the senior administrative responsibility for the entire department, with a workload that was equivalent to two full-time jobs,

while Anderson handled student affairs, and not even all of student affairs as she did not handle student employment; nor did she handle student expense reimbursements.

25. Dr. Howell informed Lewis that he was told by the Division (upon information and belief referring to Josh Beck, Associate Dean for Academic Affairs, and Christina Klespies, Senior Director of Human Resources) that the resolution of these inequities would have to wait until the Spring when all other salary reviews take place. While there is no reason the University could not have taken action to address this blatant discrimination promptly, Lewis was given a $1,500 bonus for "additional responsibilities (primary job)."

26. Dr. Howell's promises proved to be hollow as the Spring came and went but follow up on Lewis concerns. Lewis continued performing two jobs.

27. Lewis, who kept in touch with her predecessor, Rachel Morrow, who is also African American, confirmed during a conversation in the fall of 2020 that Morrow also was paid less than Anderson though performing more work than Anderson. Morrow explained, "Yes, that's why I left. I could not believe that her salary was that much higher than mine and my role was the senior administrator with twice the workload."

28. Lewis then spoke with Dr. Howell by telephone on Monday, September 21, 2020. During the call Lewis reminded Dr. Howell of their two meetings in January and February when the two discussed Lewis' salary and his promise that her salary would be reviewed in the Spring for an increase based on and in comparison to Anderson's salary. Lewis told Dr. Howell she had not received any communication in the Spring regarding this issue. Lewis went on to tell him that she felt that the way in which she had been treated was unfair and extremely troubling and that she could not continue to work as hard as she had been working and be unfairly treated with regard to compensation.

7

29. Lewis submitted her resignation in writing on September 22, 2020 and left the employ of the University on October 5, 2020.

## COUNT I

**Violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e** *et seq.,*

30. Lewis restates and reasserts paragraphs 1 through 29 as if fully restated herein.

31. Lewis' status as African American makes her a member of a protected class.

32. The University is an employer as defined by Title VII as it is a person engaged in an industry affecting commerce and has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current and proceeding calendar year. 42 U.S.C.A. § 2000e(b).

33. At all material times, Lewis met Defendant's legitimate expectations by adequately performing all her job duties as evidenced by the fact that she received positive performance reviews.

34. Defendant was aware of Lewis' status as African American.

35. Assigning Lewis additional responsibilities without providing the corresponding increases in pay is an adverse employment action under Title VII. Anderson, who is Caucasian and outside of Lewis' protected class, received far greater compensation than Lewis despite performing fewer employment duties than Lewis and refusing to process any of the Political Science Department's expenses as instructed by the University.

36. The University discriminated against Lewis by refusing to provide her equitable compensation in comparison to Anderson, a Caucasian woman outside of her protected class, while Lewis performed additional duties and held a senior role to Anderson. The University also

discriminated against Lewis by refusing to compensate her for additional work after assigning Lewis additional job responsibilities though it was the University's practice to do so.

37. The conduct of the University forced Lewis to resign her position as the alternative was to continue to work two jobs while being paid significantly less than her Caucasian counterpart who was performing substantially less work.

38. As a result of the Defendant's conduct, Lewis has and will continue to suffer damages including, but not limited to, lost earnings, lost benefits, emotional pain and suffering, humiliation, anxiety, emotional distress, and other nonpecuniary losses.

**WHEREFORE** Plaintiff respectfully request the entry of judgment in her favor and against Defendant as follows:

A. An award of damages for back pay, front pay, and other compensatory damages;

B. An award of prejudgment interest;

C. An award of punitive damages;

D. An award of reasonable attorney's fees and costs; and

E. All other relief this Court deems just.

## COUNT II

### Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

39. Lewis restates and reasserts paragraphs 1 through 38 as if fully restated herein.

40. Under 42 U.S.C. § 1981, "all persons within the jurisdiction of the United States shall have the same right in every State… to make and enforce contracts…and to the full and equal benefit of all laws… as enjoyed by white citizens."

41. Lewis' employment relationship with the University is contractual in nature so as to invoke the rights secured by 42 U.S.C. § 1981.

42. Under 42 U.S.C. § 1981(c) the University is an employer subject to § 1981 as the statute applies to all employers, including private employers.

43. Lewis is African American, making her a member of a protected class.

44. At all relevant times, Lewis met Defendant's legitimate expectations, by adequately performing all of her job duties, evidenced by the fact that she received positive performance reviews.

45. The above-described acts and omissions of the University, including but not limited to, imposing additional job duties on Lewis without providing additional compensation, not ensuring that the work was equitable distributed among Lewis and Anderson, and paying Lewis less than a similarly situated Caucasian employee outside of her protected class who performed less work, were not supported by legitimate business reasons and constituted race discrimination in violation of § 1981.

46. The University's conduct described herein was done with malice or reckless disregard for Lewis' federal rights under said law.

47. The conduct of the University forced Lewis to resign her position as the alternative was to continue to work two jobs while being paid significantly less than her Caucasian counterpart who was performing substantially less work.

48. As a result of the Defendant's conduct, Lewis has and will continue to suffer damages including, but not limited to, lost earnings, lost benefits, emotional pain and suffering, humiliation, anxiety, emotional distress, and other nonpecuniary losses.

**WHEREFORE** Plaintiff respectfully request the entry of judgment in her favor and against Defendant as follows:

  A. Compensatory damages for lost earnings, emotional pain and suffering, inconvenience, mental anguish, and other non-pecuniary losses;

  B. An award of punitive damages; and

  C. All other relief this Court deems just.

### COUNT III

**Violation of the Equal Pay Act of 2003, 820 ILCS 112/10, *et seq.***

49. Lewis restates paragraphs 1 through 48 as if fully restated herein.

50. The EPA provides that "[n]o employer may discriminate between employees by paying wages to an African-American employee at a rate less than the rate at which the employer pays wages to another employee who is not African-American for the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and which are performed under similar working conditions…" 820 ILCS 112/10(a).

51. The University is an "Employer" as defined by the EPA, as it is a corporation that employs employees in the state of Illinois. 820 ILCS 112/5.

52. The University violated the EPA by compensating Lewis less than Anderson, although Lewis and Anderson performed work requiring substantially similar skill, effort and responsibilities under similar working conditions, as both employees were Department Administrators for the Political Science Department.

53. The University's conduct described herein demonstrates that the University acted with malice or reckless indifference for Lewis' rights under said law.

54. The conduct of the University forced Lewis to resign her position as the alternative was to continue to work two jobs while being paid significantly less than her Caucasian counterpart who was performing substantially less work.

**WHEREFORE,** Plaintiff respectfully request the entry of judgment in her favor and against Defendant as follows:

A. An award of the entire amount of underpayment, together with interest, reflecting the difference in compensation between Plaintiff and Anderson under 820 ILCS § 112/30(a);

B. An award of compensatory damages;

C. An award of punitive damages; and

D. An award of attorney's fees and costs.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff request a trial by jury on all issues so triable.

Respectfully submitted,

**Dated**:  October 24, 2022                **ROSELLA LEWIS**

/s/ Ruth I. Major
One of Her Attorneys

Ruth I. Major
**The Law Offices of Ruth I. Major, P.C.**
77 West Wacker Drive, Suite 4500
Chicago, Illinois 60601
Phone: (312) 893-7544
rmajor@major-law.com